UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

BECKY TAYLOR,                                      )
                                                  )
        Plaintiff.                                )
                                                  )
    vs.                                           )        No. 4:11-CV-1747-RWS-SPM
                                                  )
MICHAEL J. ASTRUE,                                )
Commissioner of Social Security Administration,   )
                                                  )
        Defendant.                                )

## REPORT AND RECOMMENDATION
## OF UNITED STATES MAGISTRATE JUDGE

This is an action under 42 U.S.C. § 405(g) for judicial review of the final decision of

Defendant Michael J. Astrue, the Commissioner of Social Security, denying the applications of

Plaintiff Becky Taylor for disability insurance benefits under Title II of the Social Security Act,

42 U.S.C. §§ 401 *et seq.*, and for Supplemental Security Income (SSI) under Title XVI of the

Social Security Act, 42 U.S.C. §§ 405(g) *et seq.*  This matter was referred to the undersigned

United States Magistrate Judge for review and a recommended disposition pursuant to 28 U.S.C.

§ 636(b).  The undersigned recommends that the decision of the Commissioner be reversed and

the case be remanded to the ALJ for further consideration.

## I.
### PROCEDURAL HISTORY

On May 3, 2010, Plaintiff Becky Taylor filed applications for Social Security benefits

under Title II and Title XVI, alleging disability because of arthritis in the spine, severe back pain

and immobility, and learning disability, with a January 1, 2007 onset date.  (Tr. 9, 46, 100-108).

The Social Security Administration denied her claim on July 7, 2010. (Tr. 46-52). On July 13, 2011, Plaintiff filed a Request for Hearing, and a hearing was held before an Administrative Law Judge ("ALJ") on June 2, 2011. (Tr. 20-34; 54-55). On the hearing date, Plaintiff amended her alleged onset date to March 1, 2010. (Tr. 150). The ALJ issued a decision on June 23, 2011, finding Plaintiff not disabled, and Plaintiff filed a Request for Review of Hearing Decision on July 21, 2011. (Tr. 4; 9-19). The Appeals Council denied her Request for Review on September 8, 2011. (Tr. 1-3). Thus, the decision of the ALJ stands as the final decision of the Commissioner.

In her appeal of the Commissioner's decision, Plaintiff contends that the ALJ erred in determining that she was capable of performing her past relevant work and was therefore not disabled.

## II.
## FACTUAL BACKGROUND

### A. BACKGROUND

Plaintiff appeared in front of ALJ Randolph E. Schum at a hearing on June 2, 2011. (Tr. 20-30). At the time of the hearing, she was 48 years old. She completed high school and "a little bit" of college; she could not remember how much. (Tr. 22). She lives with her parents and has never lived on her own. (Tr. 28).

Plaintiff has worked as a childcare worker, an adult care worker, an office assistant, and an assembler in a factory. (Tr. 192). Plaintiff testified that in 1996 and 1997, she worked as a teacher at a day care center, where she worked on and implemented lesson plans and kept an eye on the children. In 1998, she worked at another day care, where she did the same type of work. (Tr. 23). Her Work History Report indicates that she was "[r]equired to prepare lesson plans and

crafts etc." (Tr. 195). Later, however, she testified that she worked on lesson plans with another person, so she did not have to do them by herself. (Tr. 28). While working at the day care, she lifted between 20 and 25 pounds. (Tr. 23). Between 1999 and 2002, she did assembly work. Later, between 2005 and 2007, she did assembly work for Kelly Services (a temporary agency); while doing that work, she was lifting approximately 35 pounds. (Tr. 24). In 2008 and 2009, she worked for American Staffing, another temporary agency, assembling boxes of teddy bears and candy. (Tr. 25).

Plaintiff stopped working for American Staffing in early January 2010 because she got laid off. (Tr. 25; 152). After she was laid off, she filed for unemployment. (Tr. 26). When she applied for unemployment, she represented that she was ready, willing, and able to work. She received some unemployment benefits, but she stopped receiving them in February 2010 because she had to go out of town to help an aunt who was ill. (Tr. 26).

Plaintiff testified that she had back pain that started March 1, 2010, and that there was no particular incident that brought it on. (Tr. 27). It goes from the back of her neck all the way down to her lower back. Her primary doctor, Dr. Meltz, suggested physical therapy, and she has done physical therapy exercises. (Tr. 28). When those did not help, Dr. Meltz suggested that she see another doctor, Dr. Taylor; Dr. Taylor gave her two cortisone[1] shots in her lower back, which "helped a little, but not very much." (Tr. 28-29). After that, her primary doctor, Dr. Meltz, suggested an appointment with Dr. Place to see if he would recommend back surgery; that appointment was scheduled for June 16, 2011 (two weeks after the hearing before the ALJ). (Tr. 27).

---

[1] Cortisone shots are injections that may help relieve pain and inflammation in a specific part of the body. http://www.mayoclinic.com/health/cortisone-shots/MY00268

Plaintiff also testified that she has a learning disability that makes it difficult for her to remember dates. In addition, when she is trying to explain what she wants, she "can't get it out all the time" and gets frustrated. (Tr. 27).

### B. MEDICAL TREATMENT

On July 31, 2003, Dr. Gary Meltz's treatment notes indicated that Plaintiff needed a note for limitation of work stating that she could not stand for more than 2-3 hours at a time or lift more than 50 pounds due to kyphoscoliosis.[2] (Tr. 218). Dr. Meltz treated Plaintiff on several other occasions between August 2003 and May 2008 for various ailments, including gastroesophageal reflux, abdominal pain, diarrhea, a large gall stone, upper respiratory problems, and urinary problems. (Tr. 217-19). During a July 20, 2009 visit, Plaintiff complained of headache and intermittent rib pain, and Dr. Meltz prescribed Ultracet[3] and suggested NSAIDs.[4] He noted that Plaintiff's back was nontender. (Tr. 217). Dr. Meltz's treatment notes between August 2003 and July 2009 do not contain discussions of back pain or cognitive issues. (Tr. 217-19).

On March 24, 2010, Plaintiff saw Dr. Meltz, complaining of "chronic low back pain"; Plaintiff reported that the pain got severe at times, such that she was sometimes unable to do her work, and that she was off work at that time. On physical examination, Dr. Meltz noted "[m]ild kyphoscoliosis and tenderness along the thoracic, lumbar spine"; "[m]ild discomfort on neck extension and flexion"; a negative straight leg raise; intact motor and sensory; and full range of

---

[2] Kyphoscoliosis is lateral and posterior curvature of the spine. *Stedman's Medical Dictionary* 1036 (28th ed. 2006).

[3] Ultracet is the brand name for tramadol, which is an opiate agonist used to relieve moderate to moderately severe pain. http://www.nlm.nih.gov/medlineplus/druginfo/meds/a695011.html

[4] NSAIDs are nonsteroidal anti-inflammatory drugs, a category that includes aspirin and ibuprofen. *Stedman's* 1334.

motion in the extremities. The assessment was chronic back pain, and Dr. Meltz advised physical therapy, exercise, and NSAIDs as necessary for pain. (Tr. 217).

An X-ray of the cervical spine taken March 24, 2010 showed degenerative changes at C4-5 and C5-6. (Tr. 222). An X-ray of the thoracic spine on the same day revealed mild mid-thoracic dextroscoliosis, along with moderate mid-thoracic kyphosis.[5] (Tr. 223). An X-ray of the lumbosacral spine dated March 24, 2010 reflected mild thoracolumbar levoscoliosis and minimal anterior hypertrophic spurring at the L2-3, L3-4, and L4-5 interspaces. (Tr. 224).

Between February 15, 2011 and April 12, 2011, Plaintiff saw a physical therapist on five occasions. (Tr. 263-280). Treatment notes indicate that Plaintiff had scoliosis and a long history of back pain that had worsened recently and that she was seeking pain reduction and improvements in her ability to do forward bending and light housework. (Tr. 279-280). Treatment notes from her first visit indicated that she had a learning disability and had brought her mother to help communicate. (Tr. 280). Notes from her most recent visit, on April 12, 2011, indicated that Plaintiff had not responded favorably to therapy, that she could do light housework but not heavy housework, that she had a "[s]ignificant increase in thoracic kyphosis and cervical forward head," and that her ranges of motion ranged from 0% to 100% for various movements. (Tr. 267-68).

On April 19, 2011, Plaintiff returned to Dr. Meltz, seeking a disability evaluation for her Social Security disability hearing. Dr. Meltz noted that Plaintiff was unable to work sitting or standing for more than an hour due to pain in her neck, back, and thoracic area. He also noted that she had chronic back pain, degenerative changes with kyphoscoliosis, had a learning disability, was unable to cope with certain work environments, and was limited in her ability to

---

[5] Kyphosis is "An anteriorly concave curvature of the vertebral column." *Stedman's* 1036.

comprehend certain jobs and progress. Examination showed moderate kyphoscoliosis of the spine with mild tenderness, a positive straight leg raise test at 45 degrees, and deep tendon reflexes of 1+ in the lower extremities and 2+ in the upper extremities. Dr. Meltz prescribed Relafen,[6] ordered an MRI, and referred Plaintiff to a spine surgeon, Dr. Howard Place, for evaluation of possible treatment options. (Tr. 258).

An MRI of Plaintiff's thoracic spine conducted on April 26, 2011, showed moderate kyphoscoliosis and scattered multilevel degenerative changes most severe at the T9-10 and T10-11 levels, with moderate central canal stenosis impinging the central cord. (Tr. 260). An MRI of her lumbar spine conducted on the same day showed mild lumbar degenerative changes with crowding of the L5 nerves within the L5-S1 neural foramen bilaterally. (Tr. 262).

### C. OPINION EVIDENCE

On June 25, 2010, Plaintiff was seen in a consultative evaluation by psychologist David A. Lipsitz, Ph.D. (Tr. 226-230).[7] Plaintiff complained of back pain and stated, "I'm in pain 24 x 7." She stated that she had been in a back brace for over two years when she was younger. She said that she could only lift about 25 pounds and that if she sits, stands, or walks for too long, she is in pain. (Tr. 226). She noted that her energy and interest levels were high and that she enjoyed crafts, reading, bible study, going out with friends, going out to eat, and going out to the movies. She had a driver's license and drove. She was not seeing any psychologist or psychiatrist and was not receiving any counseling or therapy. She had graduated from high

---

[6] Relafen is the brand name for nabumetone, which is an NSAID used to relieve pain, tenderness, swelling, and stiffness caused by osteoarthritis and rheumatoid arthritis. http://www.nlm.nih.gov/medlineplus/druginfo/meds/a692022.html

[7] This consultation was performed pursuant to a referral from the State of Missouri, Department of Elementary and Secondary Education, Section of Disability Determinations. (Tr. 226).

school, where she took regular classes, and she had some college courses at Florissant Valley Community College. The last time she worked was in January 2010, working on an assembly job. (Tr. 227).

Dr. Lipsitz administered a Weschler Adult Intelligence Scale (4th ed.) test, which resulted in a finding that Plaintiff was in the borderline range of intellectual functioning. Dr. Lipsitz noted that Plaintiff tended to take a trial and error rather than a systematic approach to problem solving, that she frequently made careless and impulsive mistakes, and that she was unable to adequately assimilate information or environment. Dr. Lipsitz also noted that Plaintiff had difficulty recognizing likenesses among symbols, that her vocabulary was poor, that her short-term memory was deficient, that she was unable to concentrate on a task at hand in order to put forth a good mental effort, and that her knowledge of arithmetic functions was poor. However, he also noted that she was able to do a complex matrix reasoning sequencing task and was able to learn novel tasks at an adequate pace with good eye-hand coordination. Based upon the scores, Dr. Lipsitz concluded, "One would not expect her to be able to function very effectively in more abstract or ambiguous situations and only in the more simplistic or concrete of areas would she be able to cope." He assigned a Global Assessment of Functioning score (GAF) of 60.[8] (Tr. 228-29).

---

[8] The Global Assessment of Functioning Scale (GAF) is a psychological assessment tool wherein an examiner is to "[c]onsider psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness"; it does "not include impairment in functioning due to physical (or environmental) limitations." *Diagnostic and Statistical Manual of Mental Disorders (DSM-IV)*, 32 (4th ed. 1994). A GAF of 51-60 indicates "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)." *DSM-IV* 32.

A week later, on July 2, 2010, psychologist Marsha Toll completed a Psychiatric Review Technique form for Plaintiff. (Tr. 231-241). Dr. Toll noted that Plaintiff had mild restrictions in the activities of daily living; no difficulties in maintaining social functioning; moderate difficulties in maintaining concentration, persistence, or pace; and no episodes of decompensation. (Tr. 239). Dr. Toll noted that Plaintiff had an IQ of 77 and intellectual functioning within the borderline range. (Tr. 241).

On the same day, Dr. Toll completed a Mental Residual Functional Capacity Assessment ("MRFCA") and concluded that Plaintiff "appears capable of performing simple work tasks." Dr. Toll found that Plaintiff was not significantly limited in the ability to remember locations and work-like procedures and that she had the ability to understand and remember very short and simple instructions. Dr. Toll also found no significant limitations on Plaintiff's ability to carry out very short and simple instructions; to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; to sustain an ordinary routine without special supervision; to work in coordination with or proximity to others without being distracted by them; and to make simple work-related decisions.

Dr. Toll further found no significant limitations in Plaintiff's ability to interact appropriately with the general public; to ask simple questions or request assistance; to accept instructions and respond appropriately to criticism from supervisors; to get along with coworkers or peers without distracting them or exhibiting behavioral extremes; and to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness.

Dr. Toll also found that Plaintiff was not significantly limited in her ability to respond appropriately to changes in the work setting; to be aware of normal hazards and take appropriate

precautions; to travel in unfamiliar places or use public transportation; and to set realistic goals or make plans independently of others.  Dr. Toll did, however, find that Plaintiff was moderately limited in the ability to understand or remember detailed instructions; to carry out detailed instructions; to maintain attention and concentration for extended periods; and to complete a normal workday and workweek without interruptions from psychologically-based symptoms. (Tr. 242-244).

On April 25, 2011, Dr. Meltz completed a Physical Residual Functional Capacity Questionnaire.  Dr. Meltz noted he had been seeing Plaintiff intermittently since 1985.  He noted that Plaintiff had kyphoscoliosis of the back, osteoarthritis, and a learning disability.  (Tr. 253). He stated that Plaintiff's pain or other symptoms would interfere constantly with the attention and concentration needed to perform even simple work tasks, and that Plaintiff was incapable of even low stress jobs.  (Tr. 254).  Dr. Meltz indicated she could only sit for one hour at a time and could only stand for 45 minutes at a time; that in an 8-hour workday she could sit less than 2 hours and stand or walk less than 2 hours; that she needed periods of walking around every 30 minutes for 15 minutes at a time; that she needed a position which allowed shifting positions at will from sitting, standing, or walking; that she would need to take unscheduled 15-20 minute breaks 4-5 times during an 8-hour workday; that she was occasionally able to lift less than 10 pounds and rarely 10 pounds; that she could rarely stoop or bend; and that she would likely miss, on the average, more than 4 days of work per month.  (Tr. 254-56).  He indicated that the earliest date that his descriptions of the symptoms and limitations applied was 2003.  (Tr. 256).

### D. VOCATIONAL EVIDENCE

A vocational expert, John F. McGowan, Ed. D., testified at the hearing before the ALJ. (Tr. 9; 30-34). The ALJ posed two hypotheticals to the VE. First, he asked the VE to consider a hypothetical claimant who was age 46, a high school graduate, with Plaintiff's past work experience, who "can perform a full range of light work and is able to understand, remember, and carry out at least simple instructions and non-detailed tasks." (Tr. 30). The VE testified that he thought that such a claimant could perform Plaintiff's past relevant work as a small products assembler, *Dictionary of Occupational Titles* ("*DOT*") code 739.687-030. He stated that there were 5,350 such jobs in Missouri and 814,000 jobs nationally. (Tr. 30-31).

In a second hypothetical, the ALJ described a claimant who could do the full range of sedentary work, with the same psychological restriction. The VE testified that such a claimant could not perform Plaintiff's past relevant work. However, he gave as examples of work that would fit within those mental restrictions (1) final assembler of optical goods, *DOT* code 713.687-018, with 1,160 jobs in Missouri and 288,480 jobs nationally, and (2) loader of semiconductor dies, *DOT* code 726.687-030, with 5,000 jobs in Missouri and 472,900 jobs nationally. (Tr. 31-32).

In a third hypothetical, the ALJ asked the VE to assume that Dr. Meltz's residual functional capacity questionnaire was accurate, and the VE opined that such a claimant would not be able to return to any past relevant work or other work. (Tr. 33).

### III.
### DECISION OF THE ALJ

On June 23, 2011, the ALJ issued an unfavorable decision. (Tr. 6-19). The ALJ noted that Plaintiff met the insured status requirements of the Social Security Act through December

31, 2014. He found that Plaintiff had not engaged in substantial gainful activity since March 1, 2010, the alleged amended onset date. The ALJ found that Plaintiff had severe impairments of scoliosis and degenerative changes in the spine, and borderline intellectual functioning. He then found that Plaintiff did not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1. (Tr. 11-12).

The ALJ assessed Plaintiff's RFC and found that Plaintiff had the RFC to perform the full range of light work as defined in 20 C.F.R. §§ 404.1567(b) and 416.967(b),[9] except that she is further limited in that she can understand, remember, and carry out at least simple instructions and non-detailed tasks. (Tr. 14). At various points in his decision, he also described her RFC as limited to "light unskilled work." (Tr. 16, 18). The ALJ found Plaintiff's statements concerning the intensity, persistence, and limiting effects of her symptoms not credible to the extent that they were inconsistent with his RFC assessment. (Tr. 14-16). The ALJ gave little weight to the opinion of Dr. Meltz, finding it unsupported by the medical records. (Tr. 17-18). He gave considerable weight to the opinion of Dr. Lipsitz, who had performed psychometric testing, and he gave some weight to the treatment notes from Plaintiff's physical therapist, finding those records consistent with the performance of light activities. The ALJ then found that Plaintiff was capable of performing her past relevant work as a light assembler, citing DOT number 739.687-030. (Tr. 18). Thus, the ALJ concluded that the claimant had not been under a disability, as

---

[9] "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, [a claimant] must have the ability to do substantially all of these activities." 20 C.F.R. §§ 1567(b), 416.967(b).

defined in the Social Security Act, from March 1, 2010 through the date of his decision. (Tr. 19).

## IV.
### GENERAL LEGAL PRINCIPLES

The court's role in reviewing the Commissioner's decision is to determine whether the decision "'complies with the relevant legal requirements and is supported by substantial evidence in the record as a whole.'" *Pate-Fires v. Astrue*, 564 F.3d 935, 942 (8th Cir. 2009) (quoting *Ford v. Astrue*, 518 F.3d 979, 981 (8th Cir. 2008)). "Substantial evidence is 'less than preponderance, but enough that a reasonable mind might accept it as adequate to support a conclusion.'" *Renstrom v. Astrue*, 680 F.3d 1057, 1063 (8th Cir. 2012) (quoting *Moore v. Astrue*, 572 F.3d 520, 522 (8th Cir. 2009)). In determining whether substantial evidence supports the Commissioner's decision, the court considers both evidence that supports that decision and evidence that detracts from that decision. *Id.* However, the court "'do[es] not reweigh the evidence presented to the ALJ, and [it] defer[s] to the ALJ's determinations regarding the credibility of testimony, as long as those determinations are supported by good reasons and substantial evidence.'" *Id.* (quoting *Gonzales v. Barnhart*, 465 F.3d 890, 894 (8th Cir. 2006)). "If, after reviewing the record, the court finds it is possible to draw two inconsistent positions from the evidence and one of those positions represents the ALJ's findings, the court must affirm the ALJ's decision.'" *Partee v. Astrue*, 638 F.3d 860, 863 (8th Cir. 2011) (quoting *Goff v. Barnhart*, 421 F.3d 785, 789 (8th Cir. 2005)).

The Social Security Act defines as disabled a person who is "unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to

12

last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c(a)(3)(A); *see also Hurd v. Astrue*, 621 F.3d 734, 738 (8th Cir. 2010). The impairment must be "of such severity that [the claimant] is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work." 42 U.S.C. § 1382c(a)(3)(B).

A five-step regulatory framework is used to determine whether an individual claimant qualifies for disability benefits. 20 C.F.R. §§ 404.1520(a), 416.920(a); *see also McCoy v. Astrue*, 648 F.3d 605, 611 (8th Cir. 2011) (discussing the five-step process). At Step One, the ALJ determines whether the claimant is currently engaging in "substantial gainful activity"; if so, then he is not disabled. 20 C.F.R. §§ 404.1520(a)(4)(i), 416.920(a)(4)(i); *McCoy*, 648 F.3d at 611. At Step Two, the ALJ determines whether the claimant has a severe impairment, which is "any impairment or combination of impairments which significantly limits [the claimant's] physical or mental ability to do basic work activities"; if the claimant does not have a severe impairment, he is not disabled. 20 C.F.R. §§ 404.1520(a)(4)(ii), 404.1520(c), 416.920(a)(4)(ii), 416.920(c); *McCoy*, 648 F.3d at 611. At Step Three, the ALJ evaluates whether the claimant's impairment meets or equals one of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 (the "listings"). 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii). If the claimant has such an impairment, the Commissioner will find the claimant disabled; if not, the ALJ proceeds with the rest of the five-step process. 20 C.F.R. §§ 404.1520(d), 416.920(d); *McCoy*, 648 F.3d at 611.

Prior to Step Four, the ALJ must assess the claimant's "residual functional capacity" ("RFC"), which is "the most a claimant can do despite [his] limitations." *Moore v. Astrue*, 572 F.3d 520, 523 (8th Cir. 2009) (citing 20 C.F.R. § 404.1545(a)(1)); *see also* 20 C.F.R. §§ 404.1520(e), 416.920(e). At Step Four, the ALJ determines whether the claimant can return to his past relevant work, by comparing the claimant's RFC with the physical and mental demands of the claimant's past relevant work. 20 C.F.R. §§ 404.1520(a)(4)(iv), 404.1520(f), 416.920(a)(4)(iv), 416.920(f); *McCoy*, 648 F.3d at 611. If the claimant can perform his past relevant work, he is not disabled; if the claimant cannot, the analysis proceeds to the next step. *Id.* At Step Five, the ALJ considers the claimant's RFC, age, education, and work experience to determine whether the claimant can make an adjustment to other work in the national economy; if the claimant cannot make an adjustment to other work, the claimant will be found disabled. 20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v); *McCoy*, 648 F.3d at 611.

Through Step Four, the burden remains with the claimant to prove that he is disabled. *Moore*, 572 F.3d at 523. At Step Five, the burden shifts to the Commissioner to establish that the claimant maintains the RFC to perform a significant number of jobs within the national economy. *Id.*; *Brock v. Astrue*, 674 F.3d 1062, 1064 (8th Cir. 2012).

## V.
### DISCUSSION

Plaintiff argues (1) that the ALJ's RFC finding was improper because the ALJ failed to properly consider the opinion of Plaintiff's treating physician, improperly considered her failure to seek treatment, improperly considered her financial motivation, and failed to point to "some" medical evidence in support of the RFC; and (2) that the testimony of the Vocational Expert,

which the ALJ used to determine that Plaintiff could perform past relevant work, was inconsistent with the *Dictionary of Occupational Titles*.

## A.  THE ALJ'S RFC DETERMINATION

A claimant's RFC is "the most a claimant can do despite [the claimant's] limitations." *Moore*, 572 F.3d at 523 (citing 20 C.F.R. § 404.1545(a)(1)).  "The ALJ must assess a claimant's RFC based on all relevant, credible evidence in the record, 'including the medical records, observations of treating physicians and others, and an individual's own description of his limitations.'"  *Tucker v. Barnhart*, 363 F.3d 781, 783 (8th Cir. 2004) (quoting *McKinney v. Apfel*, 228 F.3d 860, 863 (8th Cir. 2000)).  The burden of persuasion to demonstrate RFC is always on the claimant.  *Stormo v. Barnhart*, 377 F.3d 801, 806 (8th Cir. 2004).  "Because the social security disability hearing is non-adversarial, however, the ALJ's duty to develop the record exists independent of the claimant's burden in the case."  *Id.*

### 1.  Opinion of Treating Physician

In Plaintiff's first challenge to the ALJ's RFC assessment, Plaintiff contends that the ALJ improperly discarded the opinion of Plaintiff's treating physician, Gary J. Meltz, M.D.  "A treating physician's opinion is given controlling weight if it 'is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [a claimant's] case record.'"  *Tilley v. Astrue*, 580 F.3d 675, 679 (8th Cir. 2009) (quoting 20 C.F.R. § 404.1527(d)(2)).  However, "[w]hen a treating physician's opinions are inconsistent or contrary to the medical evidence as a whole, they are entitled to less weight." *Halverson v. Astrue*, 600 F.3d 922, 929-30 (8th Cir. 2010) (internal quotation marks omitted).

"When an ALJ discounts a treating physician's opinion, he should give good reasons for doing so." *Martise v. Astrue*, 641 F.3d 909, 925 (8th Cir. 2011) (quoting *Davidson v. Astrue*, 501 F.3d 987, 990 (8th Cir. 2007)).

Here, the ALJ provided several good reasons for giving little weight to Dr. Meltz's opinions. First, as the ALJ pointed out, some of Dr. Meltz's opinions were inconsistent with his own treatment notes. Dr. Meltz stated that Plaintiff had significant neck and back pain and mental limitations that would preclude her from nearly all work, and that those limitations began as early as 2003. (Tr. 253-56). However, from August 2003 through July 2009, Dr. Meltz treated Plaintiff on several occasions, and his treatment notes from those dates contain no mention of any back pain or cognitive problems. Indeed, on July 20, 2009, when Plaintiff presented with a headache and abdominal pain, Dr. Meltz reported that her back was "nontender." (Tr. 217). That inconsistency was a proper consideration in determining the weight to give to Dr. Meltz's opinion. *See Davidson v. Astrue*, 578 F.3d 838, 843 (8th Cir.2009) ("It is permissible for an ALJ to discount an opinion of a treating physician that is inconsistent with the physician's clinical treatment notes.").

In addition, as the ALJ found, many of Dr. Meltz's opinions concerning Plaintiff's physical and mental limitations appeared to be based solely or primarily on Plaintiff's statements to him, rather than on objective medical evidence. (Tr. 17-18). Although Dr. Meltz had treated Plaintiff on many occasions between 2003 and 2010, the first suggestion of any mental limitation in his notes was on April 19, 2011, which simply stated, without explanation, that Plaintiff had a "learning disability" that "[l]imits patient's ability to comprehend certain jobs and progress." (Tr. 217-19, 258). Moreover, Dr. Meltz completed his Physical Residual Functional Capacity

Assessment on April 25, 2011, prior to receiving the results of her April 26, 2011 MRI, further suggesting that his opinion was based largely on her subjective complaints rather than the objective medical evidence. (Tr. 17-18, 253-256, 259-262). It was proper for the ALJ to consider these facts in giving less weight to Dr. Meltz's opinion. *See Kirby v. Astrue*, 500 F.3d 705, 709 (8th Cir. 2007) (holding that an ALJ was entitled to give less weight to a treating physician's opinion that "was based largely on [the claimant's] subjective complaints rather than on objective medical evidence.").

The ALJ also properly considered the fact that, that until shortly before Dr. Meltz offered his opinion concerning her limitations in April 2011, Dr. Meltz had not seen Plaintiff for over a year (March 24, 2010 to April 19, 2011). (Tr. 16, 217, 258). *See Casey v. Astrue*, 503 F.3d 687, 693 (8th Cir. 2007) (holding that "the sporadic nature of the treatment relationship" was a proper consideration in deciding not to give controlling weight to a treating physician's opinion). Furthermore, as the ALJ observed, Dr. Meltz was not a mental health specialist, and thus his opinions as to her mental impairment were entitled to less weight, particularly to the extent that those opinions conflicted with those of the psychologist who examined her, Dr. Lipsitz. *See* 20 C.F.R. §§ 404.1527(c)(5), 416.927(c)(5) ("We generally give more weight to the opinion of a specialist about medical issues related to his or her area of specialty than to the opinion of a source who is not a specialist."); *Hensley v. Barnhart*, 352 F.3d 353, 356 (8th Cir. 2003) (holding that the ALJ's decision to discount treating physicians' opinions was proper when the treating physicians' opinions tended to conflict with the opinion of a specialist). In sum, the ALJ's decision to give little weight to Dr. Meltz's opinion was supported by substantial evidence.

## 2. Failure to Follow Prescribed Course of Treatment

In her second challenge to the ALJ's RFC findings, Plaintiff suggests that the ALJ was denying her benefits "because of a failure to follow a prescribed course of treatment," something that may only be done after the ALJ has considered the circumstances surrounding the failure and determined whether the treatment would restore the ability to work. *See, e.g.*, *Burnside v. Apfel*, 223 F.3d 840, 843-44 (8th Cir. 2000). However, this argument is without merit because the ALJ did not find that Plaintiff failed to follow treatment recommendations and did not deny her benefits on that ground. Instead, he merely found that her failure to *seek* medical treatment on a regular basis weighed against the credibility of her subjective complaints of disabling pain. (Tr. 15). That is a permissible consideration. *See Comstock v. Chater*, 91 F.3d 1143, 1147 (8th Cir. 1996) ("[T]he ALJ was entitled to discount [the plaintiff's] complaints [of disabling pain] based on his failure to pursue regular medical treatment."). Notably, Plaintiff does not argue that her failure to pursue medical treatment should have been excused because of financial hardship or some other reason.

## 3. Financial Motivation

In his third challenge to the ALJ's RFC findings, Plaintiff argues that the ALJ improperly considered Plaintiff's possible financial motivation as a factor that undermined her credibility. The undersigned disagrees. Plaintiff correctly states that the Eighth Circuit has observed that "all disability claimants are financially motivated to some extent." *Ramirez v. Barnhart*, 292 F.3d 576, 581 n.4 (8th Cir. 2002). However, it stated in the same paragraph that "a claimant's financial motivation may contribute to an adverse credibility determination when other factors cast doubt upon the claimant's credibility." *Id.* The ALJ properly considered evidence of

Plaintiff's financial motivation in combination with numerous other factors that cast doubt on the credibility of her subjective complaints, including inconsistencies in her testimony, failure to seek regular treatment for back pain or cognitive issues, her educational and work history, and a lack of consistency between Plaintiff's complaints and the medical record. (Tr. 15-17).[10]

### 4. Failure to Point to "Some" Medical Evidence

In her fourth challenge to the ALJ's RFC findings, Plaintiff argues that the ALJ improperly failed to point to "some" medical evidence in support of his RFC. Although the ALJ bears the primary responsibility for assessing a claimant's RFC based on all relevant evidence, a claimant's RFC is a medical question. *Hutsell v. Massanari*, 259 F.3d 707, 711 (8th Cir. 2001). Therefore, although the ALJ is not limited to considering medical evidence, "some medical evidence 'must support the determination of the claimant's RFC, and the ALJ should obtain medical evidence that addresses the claimant's ability to function in the workplace.'" *Id.* at 712 (quoting *Lauer v. Apfel*, 245 F.3d 700, 704 (8th Cir. 2001)). "To properly determine a claimant's residual functional capacity, an ALJ is . . . 'required to consider at least some supporting evidence from a [medical] professional.'" *Hutsell*, 259 F.3d at 712 (quoting *Lauer*, 245 F.3d at 704).

Plaintiff relies on *Lauer v. Apfel* in support of her argument. In *Lauer*, the ALJ declined to adopt the opinions of the claimant's treating psychiatrist and of an examining psychologist that the claimant's ability to perform work-related functions was limited or non-existent due to his mental impairments, finding instead that he was restricted only in his ability to interact with the public. *Id.* at 703-04. The Eighth Circuit emphasized that in determining the Plaintiff's

---

[10] Aside from her challenge to the ALJ's mention of her financial motivation, Plaintiff does not challenge the ALJ's credibility findings.

RFC, "the ALJ was required to consider at least some supporting evidence from a professional." Id. at 704. It stated, "Even if the ALJ provided ample reasons for his decision not to adopt the opinions of [Plaintiff's treating psychiatrist] or of [the examining psychologist], we have located no medical evidence to support the ALJ's conclusion that [the claimant's] mental impairments, the existence of which the ALJ acknowledged, limited only the degree to which he could interact with the public." *Id.* The court noted that "[t]he decision of the ALJ is itself unclear as to the medical basis, if any, for his assessment of the degree to which [the claimant's] mental impairments affected his RFC." *Id.* at 705. It stated, "We believe that to determine [the claimant's] RFC . . . the ALJ had to address complex medical issues that could be resolved only with professional assistance, and that the professional opinions in the record do not support the ALJ's assessment of the degree to which the mental impairments affect [the claimant's] RFC." *Id.* The court thus found that the ALJ's decision was not supported by substantial evidence. *Id.*

The undersigned finds *Lauer* applicable here.[11]  Here, the only medical opinion evidence regarding Plaintiff's physical abilities was provided by Dr. Meltz, who opined that Plaintiff was incapable of nearly all work activities. (Tr. 253-56). No medical source opined that Plaintiff could perform the actions required to do light work. Moreover, the undersigned finds no other medical evidence from which the ALJ could have ascertained that Plaintiff had the residual functional capacity needed to perform light work. The ALJ stated that Plaintiff's MRI results as to the thoracic spine did not support significant limitations as to sitting and standing/walking. (Tr. 18). However, he does not explain how the results led him to that conclusion, nor is it apparent from the records. The MRI shows "degenerative changes most severe at the T9-T10

_____

[11] Although Plaintiff relies heavily on *Lauer* in her brief, the Commissioner does not cite *Lauer* in his brief and does not explain how it can be distinguished from the case at bar.

and T10-11 levels with moderate central canal stenosis impinging the central cord." (Tr. 259-60). In the absence of any explanation of the meaning of those results, the undersigned does not find this MRI to be "some medical evidence" in support of the ALJ's assessment that Plaintiff can perform light work. *See Dixon v. Barnhart*, 324 F.3d 997, 1002 (8th Cir. 2003) (reversing and remanding for further development of the record where the ALJ relied on a negative "cardiolyte test" to determine the claimant's limitations without explaining the significance of that test; stating that absent development of the record regarding what the test results meant relative to the plaintiff's ability to work, it was "not possible to ascertain [the claimant's] ability to work without engaging in medical conjecture"); *Shontos v. Barnhart*, 328 F.3d 418, 427 (8th Cir. 2003) (reversing and remanding where the ALJ improperly discounted the opinion of a treating physician and "improperly drew inferences from the medical reports" to generate an RFC assessment); *Nevland v. Apfel*, 204 F.3d 853, 858 (8th Cir. 2000) ("An administrative law judge may not draw upon his own inferences from medical reports." (internal quotation marks omitted)).

The ALJ also stated that the treatment notes from Plaintiff's physical therapist were consistent with the performance of light activities. (Tr. 18). Again, however, he did not explain how he reached that conclusion, nor is it apparent from the records themselves that they support it. The physical therapist's most recent notes show an objective examination with "[s]ignificant increase in thoracic kyphosis and cervical forward head," note objective range of motion percentages ranging from 0% to 100%, and note that Plaintiff can perform light housework but not heavy housework. (Tr. 263-280). As discussed previously, the ALJ is not permitted to draw his own inferences from medical reports. Moreover, the Eighth Circuit "has repeatedly observed

that the ability to do activities such as light housework . . . provides little or no support for the finding that a claimant can provide full-time competitive work." *Reed v. Barnhart*, 399 F.3d 917, 923 (8th Cir. 2005) (internal quotation marks omitted). Thus, these notes do not provide evidence of Plaintiff's ability to perform light work.

The undersigned further notes that in determining Plaintiff's RFC, the ALJ appeared to place significant weight on his erroneous belief that Plaintiff had not been prescribed pain medication; he mentioned it three times in his opinion. (Tr. 16-17). In fact, the record shows that Dr. Meltz prescribed Ultracet (an opiate) in July 2009 for Plaintiff's rib pain and/or headache, and he prescribed Relafen (a prescription NSAID) for her back pain in 2011. (Tr. 217, 258). In addition, Plaintiff testified that she saw a Dr. Taylor on May 10, 2011, and received two cortisone shots in her lower back, testimony that the ALJ did not discuss in assessing her RFC. (Tr. 14, 28-29). On remand, the ALJ should consider this evidence.

In sum, even if Plaintiff properly gave little weight to the opinion of Dr. Meltz indicating that Plaintiff could not perform light work, the undersigned agrees with Plaintiff that the ALJ's determination that Plaintiff could perform light work was not supported by "some medical evidence" addressing the claimant's ability to function in the workplace. Accordingly, the undersigned recommends that the matter be reversed and remanded to the ALJ for further consideration, which may require supplementation with the opinion of a medical examiner as to Plaintiff's ability to function in the workplace. *See Lauer*, 245 F.3d at 704-06; *Loveland v. Astrue*, 734 F. Supp. 2d 857, 868 (E.D. Mo. 2010) (reversing and remanding for possible

supplementation with the opinion of a medical examiner as to Plaintiff's work-related abilities where the court found no medical evidence in support of the ALJ's RFC assessment).

With respect to Plaintiff's mental impairments, the undersigned notes that the evidence in the record arguably supports the ALJ's RFC assessment. However, on remand, in considering Plaintiff's RFC, the ALJ must assess the combined effect of both her mental and physical impairments. *See* 20 C.F.R. §§ 404.1523, 416.923 ("[W]e will consider the combined effect of all of your impairments . . . the combined impact of the impairments will be considered throughout the disability determination process"); *Cunningham v. Apfel*, 222 F.3d 496, 501 (8th Cir. 2000) (noting that the ALJ must consider "the combined effect of all impairments without regard to whether any such impairment, if considered separately, would be of sufficient medical severity to be disabling"); *Scott v. Astrue*, No. 4:11-CV-295-AGF, 2012 WL 4479128, at *21 (E.D. Mo. Sept. 28, 2012) (remanding for the ALJ to consider the combined effect of the plaintiff's mental and physical impairments even where the evidence arguably supported the ALJ's RFC assessment with respect to the plaintiff's physical impairments).

## B. TESTIMONY OF THE VOCATIONAL EXPERT

Plaintiff argues (1) that the testimony of the Vocational Expert, which the ALJ used to determine that Plaintiff could perform past relevant work, was inconsistent with the *Dictionary of Occupational Titles*, and (2) that the hypothetical question posed to the VE does not capture the concrete consequences of Plaintiff's impairment, because the ALJ's RFC assessment was not supported by "some" medical evidence.

A hypothetical question to a VE "must capture the concrete consequences of the claimant's deficiencies." *Hunt v. Massanari*, 250 F.3d 622, 625 (8th Cir. 2001). The question "'needs to include only those impairments that the ALJ finds are substantially supported by the record as a whole.'" *Martise v. Astrue*, 641 F.3d at 927 (quoting *Lacroix v. Barnhart*, 465 F.3d 881, 889 (8th Cir. 2006)); *see also Howe v. Astrue*, 499 F.3d 835, 842 (8th Cir. 2007) ("A hypothetical . . . need only include impairments that are supported by the record and that the ALJ accepts as valid."). In formulating the hypothetical, "the ALJ may exclude any alleged impairments that [the ALJ] has properly rejected as untrue or unsubstantiated." *Hunt,* 250 F.3d at 625.

Here, the ALJ's hypothetical was based on his RFC assessment. As discussed above, the ALJ's RFC assessment was not supported by "some medical evidence," as required by the Eighth Circuit. Thus, the undersigned finds that the ALJ's hypothetical question based on that RFC did not constitute substantial evidence in support of his finding. *See Lauer*, 245 F.3d at 706 ("Because the hypothetical question posed to the vocational expert was based upon the faulty determination of [the plaintiff's] RFC, the vocational expert's answer to that question cannot constitute sufficient evidence that [the plaintiff] was able to engage in substantial gainful employment.").

Nonetheless, because it is possible that the ALJ's RFC assessment will remain the same even after reconsideration on remand, the undersigned will address Plaintiff's argument that the testimony of the Vocational Expert was inconsistent with the *Dictionary of Occupational Titles*. The VE testified that Plaintiff could perform her past relevant work in light assembly, a job with a reasoning level of two. (Tr. 30-31). A reasoning level of two requires a person to "[a]pply

commonsense understanding to carry out detailed but uninvolved written or oral instructions." (*DOT* Appendix C). Plaintiff contends that that requirement is inconsistent with the ALJ's request that the VE assume a claimant who could "understand, remember, and carry out at least simple instructions and non-detailed tasks." (Tr. 30).

The Eighth Circuit has previously rejected a similar argument. In *Moore v. Astrue*, 623 F.3d 599, 604 (8th Cir. 2010), the Eighth Circuit held that a hypothetical stating that a claimant was capable of "carrying out simple job instructions" and performing "simple, routine and repetitive work activity at the unskilled task level" was not inconsistent with the VE's opinion that the claimant could perform jobs with a reasoning level of two. *Id.* The court stated:

> [T]he ALJ did not limit "simple" job instructions to "simple one- or two-step instructions" or otherwise indicate that [the claimant] could perform only occupations at a DOT Level 1 reasoning level. Indeed, the Level 2 reasoning definition refers to "detailed but uninvolved" instructions. DOT at 1011 (emphasis added). The dictionary defines "uninvolved" as "not involved," and in turn defines "involved" as "complicated, intricate." *Webster's Third New Int'l Dictionary* 1191, 2499 (2002). There is no direct conflict between "carrying out simple job instructions" for "simple, routine and repetitive work activity," as in the hypothetical, and the vocational expert's identification of occupations involving instructions that, while potentially detailed, are not complicated or intricate.

*Id.* *See also Floyd v. Astrue*, No. 4:10-CV-329-TCM, 2011 WL 864862, at *16 (E.D. Mo. March 11, 2011) (rejecting the argument that jobs with a reasoning level of two were inconsistent with a hypothetical describing a person who could understand, remember, and carry out simple instructions and detailed tasks) (citing *Moore v. Astrue*, 623 F.3d at 604).

Here, as in *Moore* and *Floyd*, the ALJ did not limit "simple" job instructions to those requiring one or two step instructions, nor did he otherwise indicate that Plaintiff could perform

only occupations at a *DOT* Level 1 reasoning level. Thus, the undersigned finds no inconsistency between the VE's testimony and the *DOT*.

## VI.
### CONCLUSION

For the reasons set forth above, the undersigned finds that the decision of the Commissioner was not supported by substantial evidence. Accordingly,

**IT IS HEREBY RECOMMENDED** that decision of the Commissioner of Social Security be **REVERSED** and that this case be **REMANDED** under Sentence Four of 42 U.S.C. § 405(g) for reconsideration and further proceedings consistent with this opinion.

The parties are advised that they have fourteen (14) days in which to file written objections to this Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1), unless an extension of time for good cause is obtained, and that failure to file timely objections may result in a waiver of the right to appeal questions of fact. *See Thompson v. Nix*, 897 F.2d 356 (8th Cir. 1990).

<div style="margin-left:40%">

/s/Shirley Padmore Mensah
SHIRLEY PADMORE MENSAH
UNITED STATES MAGISTRATE JUDGE

</div>

Dated this <u>9th</u> day of November, 2012.